UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEAN A. BRANDENBURG,

                Plaintiff,

      v.                                            Case No. 14-CV-835

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.

---

## DECISION AND ORDER

---

This is an action for review of the final decision of the Commissioner of Social Security denying Plaintiff Dean Brandenburg's application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*. For the reasons below, the Commissioner's decision will be reversed and remanded pursuant to 42 U.S.C. § 405(g) (sentence four).

### PROCEDURAL HISTORY

On December 16, 2010, Plaintiff filed applications for supplemental security income, a period of disability, and disability insurance benefits beginning in February 26, 2009. His applications were denied initially and on reconsideration. On January 29, 2013, a hearing was held before an Administrative Law Judge (ALJ), at which Plaintiff and a Vocational Expert (VE) testified. Plaintiff was represented by counsel.

On March 7, 2013, the ALJ issued a decision denying Plaintiff's applications for benefits. The ALJ found Plaintiff had severe impairments of degenerative disc disease of the cervical spine,

tendinitis, migraine headaches, and amputation of the left ring finger. (R. 22.) The ALJ concluded that none of Plaintiff's impairments met or medically equaled the severity of a listed impairment and that Plaintiff had the residual functional capacity (RFC) to perform light work with the following exceptions: he is limited to occasional pushing or pulling and precluded from reaching above shoulder level with the right upper extremity; he is limited to rare use of the upper left extremity for grasping and manipulating objects; he is precluded from climbing ropes, ladders, and scaffolding; he is limited to occasional crawling; he should avoid more than frequent exposure to extreme cold; he should avoid more than occasional exposure to vibration of the right upper extremity; and he could be expected to be off task up to 10% of the work day in addition to regularly scheduled breaks due to pain from orthopedic disorders. (R. 24.)

The ALJ then concluded that Plaintiff was not disabled because he remained capable of performing his past work doing lawn care and snow removal which the VE had classified as a commercial cleaner. (R. 28, 79.) Alternatively, the ALJ concluded that Plaintiff could perform other jobs that the V.E. identified, including information clerk, office clerk, and stock clerk. (R. 29.) The Appeals Council denied review on February 28, 2014, making the ALJ's decision the final Agency decision.

Plaintiff seeks review under 42 U.S.C. § 405(g). Plaintiff argues that the decision of the ALJ should be reversed for the following reasons: (1) the ALJ failed to consider Plaintiff's obesity in combination with his other impairments; (2) the ALJ erred in failing to identify the evidence in the record that supports his RFC finding and by failing to consider the cumulative effect of his impairments; (3) the ALJ erred in failing to properly assess the opinion of his treating specialist; (4) the ALJ erred in failing to properly assess his credibility; and (5) the ALJ erred in failing to properly

2

analyze Plaintiff's migraine headaches.

The Commissioner concedes that the ALJ's conclusion that Plaintiff was not disabled because he could return to his previous work as a cleaner is erroneous because Plaintiff's work as a cleaner was not "substantial gainful activity" as required under the Social Security Administration's regulations. (Commissioner's Br. 15, ECF No. 18.) The Commissioner nevertheless defends the denial of benefits on the ALJ's alternative finding that Plaintiff could perform work as a an information clerk, office clerk, and stock clerk. (R. 29.) The Commissioner denies that the ALJ otherwise erred in his analysis of the evidence.

## PLAINTIFF'S CLAIMS AND MEDICAL EVIDENCE

As noted above, Plaintiff filed his applications for SSI and disability benefits on December 16, 2010, claiming an onset date of February 26, 2009. At the alleged onset date, Plaintiff was 39 years old and he had recently been terminated from a cheese company where he had worked for more than ten years. (R. 56, 196.) In a January 2011 Social Security Administration (SSA) Function Report, Plaintiff described his physical limitations as follows: "Shoulders are bad with hurting knees and hips, and have hardly any patience at all. Can't lift a gallon of milk, and reaching and extending my arms is really hard, and arms and fingers go numb." (R. 193.) He stated that his daily activities consisted of watching television (which was all his body allowed him to do), going to dinner, visiting friends, making simple lunches, light housework and caring for his five-year-old daughter. (R. 188.) He reported he also did part time work doing lawn mowing and snow removal for a nearby apartment complex using riding equipment. (R. 190.) A subsequent account has Plaintiff running his own lawn care and snow removal business working fifteen to twenty hours per week. (R. 537.)

3

On April 26, 2011, in a subsequent report completed by his attorney, Plaintiff expanded on his condition:

> I have severe pain in both shoulders. Pain shoots down my arm. My fingers go numb. Can't stand for very long because my left hip starts hurting. Knees lock up. I have trouble walking and pain walking up and down stairs. My headaches/migraines are severe. I get them every other day and sometime every day. When I get a migraine, I have to turn off the lights and have no noise at all. The migraines are totally disabling. I can't think, drive or do anything when I get a migraine. I sometimes have to lay on the couch and have passed out from migraines already. Vomit a lot from migraines. Limited use of left hand given the snow blower accident in 2005.

(R. 199, 204.)

The medical record, at least at the time Plaintiff offered this description of his impairments, did not support the severe debilitating conditions he claimed. It did show he had some impairment of his shoulders and left hand, but there was little to substantiate Plaintiff's complaints of hip pain or locking knees, nor were there indications in the medical record that Plaintiff sought more than episodic treatment for depression and migraine headaches prior to the time he filed his applications for benefits. (R. 426.) And despite the fact he was seeing an orthopedic physician for his shoulder problems throughout 2009 and 2010, he made little to no mention of any back or leg problems to his physician during that time though he did have periodic visits with his chiropractor. (R. 309-17, 367-76.)

As for his shoulders and left hand, the medical record shows that Plaintiff had relatively short bouts of right shoulder pain and discomfort in October 1998, March 2004, and April 2005 for which he received ibuprofin, physical therapy and injections. (R. 266-74.) He also suffered a partial amputation of the index finger on his left hand in a snow blower accident in February 2005 and an ulnar deviation of his middle finger. (R. 267.) He was treated during these episodes by Dr.

4

Paul Shuler at the Beaver Dam Orthopaedic Clinic, but continued working at the cheese company without apparent difficulty.

In November 2008, Plaintiff was treated for a right biceps strain. (R. 278.) Physical therapy was prescribed and he was released to work with increasing weight limitations on the use of his right arm over the next several weeks. (R. 279-82.) His employment was terminated in December 2008, shortly after he came off of light duty, allegedly for hitting someone. (R. 56, 196.) He has had no full-time employment since that time.

In February 2009, Plaintiff saw Dr. Shuler with a chief complaint of right shoulder pain. (R. 264-65.) Dr. Shuler ordered an MRI which showed "possible labral tear, rotator cuff impingement." (R. 263.) Shortly thereafter, Plaintiff underwent right shoulder labral repair, arthroscopic subacromial decompression, and distal clavicle excision. By April 2009, Plaintiff's incisions were well healed and he was doing well overall. (R. 259.) He had essentially full range of motion and 5- strength in flexion and abduction with slight limitation to internal rotation. Plaintiff reported that his left shoulder hurt more than his right when he used a hand bike, but otherwise was not having pain.

Over the next several months, Plaintiff reported to Dr. Shuler that his condition was either staying the same or getting worse. By October 2009, he reported that the pain was worse than before the surgery. Further examination and testing showed possible persistent or recurrent labral tear in the right shoulder. (R. 249.) In February 2010, Plaintiff added to his complaint of right shoulder pain a complaint of pain in his left shoulder. (R. 242.) X-rays of his left shoulder and cervical spine were taken. The cervical spine x-ray showed no evidence of fracture, dislocation, subluxation or marked boney lesion. The left shoulder x-rays showed minimal degenerative

5

changes of the acromioclavicular joint without fracture, dislocation, subluxation or boney lesion. (R. 242.) Dr. Shuler's impression was persistent labral tear on the right and some shoulder impingement, synovitus on the left. Plaintiff elected not to have further surgery on his right shoulder but received an injection on his left. He was to return on an as needed basis. (R. 243.)

Plaintiff returned to Dr. Shuler on July 7, 2010, complaining of numbness in both arms and inability to pick anything up. Dr. Shuler ordered an MRI of the cervical spine and wrote a letter "to whom it may concern" placing on Plaintiff a 10 pound lifting restriction. (R. 240-42.) The MRI completed on July 12, 2010, showed a normal cervical spine with mild left-sided neural foraminal narrowing at the C4-5 level. (R. 239.) Based Plaintiff's continued complaints, Dr. Shuler referred him to W. Fowler, M.D., a Physical Medicine and Rehabilitation Specialist, on July 15, 2010. The 10 pound lifting limit was continued pending his examination by Dr. Fowler. (R. 237.)

Dr. Fowler conducted an extensive interview and examination of Plaintiff on July 28, 2010. (R. 310.) Plaintiff's chief complaint was shoulder pain, right worse than left, with associated intermittent bilateral hand numbness. Although Plaintiff also reported "somewhat chronic intermittent low back and/or bilateral knee pain," he confirmed that it was his shoulder pain that was "his far most bothersome and activity limiting discomfort." (R. 311.) He also complained of "associated constant localized occipital muscular pain, with associated headaches that sometimes radiates toward his eyes," and admitted to "mild depression" since his employment was terminated and his wife was filing for divorce. (*Id.*)

Dr. Fowler's findings on physical examination were for the most part unremarkable. He noted that both of Plaintiff's shoulders had at least 90 degrees of abduction and flexion with the left having slightly more than the right. There was slight diffuse bilateral tenderness but no swelling.

6

On internal rotation, there was a positive impingement sign on the left but negative on the right. Dr. Fowler also noted a well-healed amputation of the distal index finger, along with ulnar deviation of the middle finger on the left hand. (R. 312.) Plaintiff's muscle tone was normal, and his muscle strength was likewise normal (5/5) "except for mild pain associated 5 minus/5 weakness during isolated testing of bilateral supraspinatus." (*Id.*)

Based on his interview and examination, Dr. Fowler offered diagnoses of adjustment disorder with depressed mood, tension-type headache, and pain in joint involving shoulder region. (R. 313.) His treatment recommendations included active involvement in treatment program with regular exercise, developing a future work plan, use of massage and over-the-counter medications, and resumption of leisure activities. (Id.)

Records show that Plaintiff next saw Dr. Shuler the following year in May 2011 for a follow up. He reported at that time that he was having many of the same symptoms as before, including pain with overhead lifting and some numbness and tingling with repetitive use. He was using Tylenol for pain control. (R. 403.) An MR Arthrogram was ordered to see if there were any changes, but no follow-up visit is noted until more than a year later in January 2013, just before the hearing before the ALJ. At that time, Plaintiff continued to complain of shoulder pain but also states his head aches are getting worse. Consideration was given to injections and future surgery. Dr. Shuler recommended a neurology consultation. (R. 528-30.) On February 7, 2013, a week after the hearing before the ALJ, Plaintiff again saw Dr. Shuler. Decisions regarding surgery were put off pending neurology and rheumatology consultations, both of which were essentially negative. (R. 509-10, 536-38.)

The neurological exam was done by Dr. Victor Diaz. In a report issued on February 12,

7

2013, two weeks after the hearing before the ALJ, Dr. Diaz summarized Plaintiff's medical history noting that although he presented with a multitude of complaints in January, "his exam revealed no obvious neurological deficits." (R. 509, 26.) Dr. Diaz noted Plaintiff "had more give away due to pain in the right shoulder and left hip. He claims saddle anesthesia, weakness in all four limbs which would be concerning for spinal stenosis but he does not have any B/B symptoms and no hyperreflexia with normal strength and no clonus." (R. 509.) Because of the absence of abnormal findings from MRIs, EMG, nerve conduction study and his own exam, Dr. Diaz "suspected a significant overlap of anxiety/functional deficits." (*Id.*)

The rheumatology consult was performed by Dr. Daniel Malone. In a February 26, 2013 report, Dr. Malone noted that the neurologic evaluation by Dr. Diaz, which included EMGs and nerve conduction velocities as well as two appointments with neurologic examinations, "found basically no significant abnormality, certainly nothing to explain his diffuse and serious symptoms." (R. 537.) Dr. Malone noted that a recent cervical MRI "showed only minor changes, certainly again not enough to explain the patient's symptoms." (*Id.*) In testing for fibromyalgia, Dr. Malone noted that "palpation of all 18 fibromyalgia standardized trigger points reveals only 2 with lowered pain thresholds." (*Id.*) Assuming negative results on blood tests he ordered to rule out other possible causes, Dr. Malone thought the most likely explanation was chronic pain syndrome. (R. 538.)

The January 2013 EMG and nerve conduction study referenced by Drs. Diaz and Malone, was ordered in response to Plaintiff's "diffuse complaints of myalgias, weakness in arms and legs as well as radicular like symptoms radiating from the neck to the arms and the back to legs with dysesthesias, generalized" was also "minimally abnormal." (R. 508, 26.) The study revealed "no evidence for myopathy, polyneuropathy or radiculopathy." (R. 508.)

8

As noted above, Plaintiff was also seeking chiropractic care during much of this same time. The record shows approximately thirty visits with M.C. Johnson, D.C., between December 11, 2009, and December 17, 2012. (R. 367-376, 428-32, 497-99.) Each report sets forth essentially the same complaint, description of treatment and plan:

> left upper cervical spine pain and stiffness with headaches. VAS 7/10. The pain is described as sharp stab, frequent, and moderate. Secondary complaints are of mid to low back pain and stiffness. VAS 7/10. The pain is described as sharp stab, frequent, and moderate. The cause is undetermined.

(R. 369.) The treatment notes go on to state that the condition is aggravated by lifting and relieved by lying down. Palpation is noted to reveal areas of myofacial tenderness and myospasm and adjustments are performed to relieve pain in the short term, and restore function to and strengthen the spine.

With respect to Plaintiff's complaint of migraine headaches, the medical record shows that in January 2009 Plaintiff estimated that he had one headache per month. (R. 295.) On medical evaluation forms completed in January, February, and April 2009, Plaintiff reported no headaches. (R. 296- 300.) In July 2010, Plaintiff reported to his doctor that Imitrex works great for his head aches. (R. 292.) In July 2011, he reported frequent headaches but continued to report that Imitrex works. (R. 421.) On March 26, 2012, Plaintiff reported that he had been having two to three migraines per week since he suffered a concussion three weeks earlier. He continued to take Imitrex and by April 2, 2012, reported the pain "completely gone," though he did complain of increasing dizziness. (R. 435, 437.) He likewise reported that medication relieved his headaches in May 2012, but complained of feeling exhausted afterwards. (R. 475.)

The earliest medical report of the kind of severe migraine Plaintiff described in his disability

9

report to SSA in April 2011 appears in an emergency department record of a visit Plaintiff made to Waupun Memorial Hospital on December 7, 2012, less than two months before his hearing. (R. 505.) Plaintiff arrived at the hospital at approximately 6:45 p.m. complaining of a headache that began four days ago. He described the course/duration of his symptoms as constant. The location was right frontal face with radiating pain in the occipital region of the head. He described his pain as throbbing and rated it a nine on a ten-point scale. He listed exacerbating factors of light and noise and no relieving factors. He stated he had been having migraines since he was a child and described his prior episodes as frequent and chronic. Neurological examination was essentially normal and no focal neurological deficit was observed. Plaintiff was given Reglan and Benadryl by IV and discharged a little over an hour after he arrived with his report of pain now at one. (R. 506.) Plaintiff visited the emergency department at Waupun Memorial Hospital with similar complaints and even briefer visits on May 22 and June 5, 2013, but by that time the record had been closed and the ALJ's decision had been issued. (R. 512, 514, 29.)

As for mental impairments, a January 2009 letter to whom it may concern from his therapist states that Plaintiff was first seen in the early summer of 2006 and was diagnosed with dysthymia, Post-Traumatic Stress Disorder (due to the snow blower accident), anxiety disorder, and avoidant personality traits. (R. 235.) He began therapy and was started on Zoloft and then Lexapro and Effexor. Under a heading "workplace recommendations," the therapist stated:

> Dean Brandenburg is capable of good workplace productivity while involved in a structured environment. This environment should include a clear set of expectations of conduct and regular access to supervisors' input; especially at times when Dean feels threatened by his co-workers. A low-conflict environment will allow him to focus on personal productivity and avoid situations that might distract him from his job tasks.

10

(R. 236.)

A May 24, 2010 progress note from Affiliated Clinic states Plaintiff was started on Celexa for depression in March but that he discontinued it three weeks ago because he didn't think it was working. He reported feeling low because his wife was threatening to leave him, which she later did, and take their four-year-old daughter with her, and because of his inability to work because his shoulders hurt all the time. He also thought his wife needed medication. (R. 233.) The therapist discussed his becoming more active in getting training or education for future employment as a way of helping his marital situation, but ultimately the divorce occurred. Other than sporadic references to depression in the records of Plaintiff's family doctor, there are no other records of treatment for any mental impairment.

Finally, the record also contains the reports of several state agency consultants based on their review of Plaintiff's medical record. Using the SSA's Psychiatric Review Technique form, Psychologist Esther Lefevre found from her review of the record on March 20, 2011, that Plaintiff had no limitations in the four broad functional areas set out in the disability regulations for evaluating mental disorders, and thus did not have a severe mental impairment. 20 C.F.R. § 404.1520a(d)(1) and 416.920a(d)(1). Dr. Lefevre noted in her report that Plaintiff's psychiatric symptoms appear to be mild and due to marital issues with no significant impact on functioning. (R. 387, 389.) Dr. Lefevre's conclusions were affirmed by Psychologist Craig Childs based on his review of the record on October 6, 2011. Dr. Childs noted that considering all objective reports, Plaintiff's activities of daily living and his own statements on mental function, Plaintiff had an adjustment disorder with depressed mood but presented no significant work-related restrictions. (R. 427.)

11

With respect to his physical impairments, Dr. Janis Byrd noted Plaintiff's complaint that watching television is all his body allows him to do, other than visiting friends and going to dinner, but stated that the severity of his statements is not supported by the evidence in the file. (R. 398.) From her review of the record, Dr. Byrd concluded on March 30, 2011, that Plaintiff's exams and functioning were consistent with a light work RFC with occasional overhead reaching. She found "no evidence of bad knees or hips," and noted that Plaintiff did not indicate limitations due to his left hand injury. (*Id.*)

Dr. Byrd's opinion of Plaintiff's RFC was affirmed by Dr. George Walcott on October 5, 2011. Dr. Walcott noted in the report cited by the ALJ that Plaintiff's only abnormalities "are seen within the shoulders, with 5-/5 strength secondary to pain; he does have some mild impingement; he can abduct to 90 comfortably & forward flexion is 135." (R. 426.) Plaintiff's pain was managed with tylenol. Dr. Walcott also noted that there is nothing in the medical record that indicates he has functional restrictions from the standpoint of back or joints other than the shoulders. (R. 426.)

## ANALYSIS

A person who applies for disability insurance benefits or SSI has the burden of proving he or she is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A).

The statute that authorizes judicial review of a decision of the Commissioner of Social Security states in relevant part:

12

> The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to a hearing before the Commissioner of Social Security, because of the failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g). Here there is no claim that the claimant failed to submit proof in conformity with a regulation prescribed in subsection (a). Thus, insofar as § 405(g) is concerned, the sole issue is whether the Commissioner's findings are supported by substantial evidence.

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion .... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted). In other words, the standard is "highly deferential." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). And though an argument can be made that judicial review in disability cases is factual in nature, review at the court of appeals level is de novo. *See* Denlow, Morton, *Substantial Evidence Review In Social Security Cases As An Issue of Fact*, 28 J. Nat'l Ass'n Admin. L. Judiciary Iss. 1 (2008).

If the only issue before the Court was whether substantial evidence supports the ALJ's determination that Plaintiff was not disabled, the ALJ's decision in this case would be readily

13

affirmed.  The negative findings in the numerous tests, examinations, and studies performed on Plaintiff in response to his many complaints over the four years after his employment was terminated, combined with the opinions of the non-examining physicians and psychologists that reviewed the medical record, constitute substantial evidence that Plaintiff is not as severely impaired as he claims.  Notwithstanding the plain language of § 405(g), however, judicial review of a decision of the Commissioner is not limited to whether the findings are supported by substantial evidence.  To be affirmed, the Commissioner's decision must also meet two additional requirements which contribute substantially to the increase in the number of reversals in Social Security disability cases.

First, in addition to review for substantial evidence in support of the Commissioner's findings, judicial review has been extended to the question whether the ALJ has complied with the Agency's own rules and regulations.  Pursuant to the authority granted her by Congress, the Commissioner has promulgated a complex series of rules, regulations and procedures to carry out her responsibilities and "to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits [under the Act]."  42 U.S.C. § 405(a).  Where the ALJ has failed to comply with these regulations and rulings, reversal is required unless the error is shown to be harmless.  *Pepper v. Colvin*, 712 F.3d 351, 364-65 (7th Cir. 2013); *Moss v. Astrue*, 555 F.3d 556, 560-62 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008).

Compliance with the Agency's own regulations and rules presents its own set of difficulties for the Commissioner.  These rules and regulations set forth detailed instructions to Agency staff and ALJs on the manner in which they are to analyze and weigh evidence of physical and mental impairments in the form of physician opinions and claimant reports of pain and weakness.  *See, e.g.,*

20 C.F.R. §§ 404.1520 (Evaluation of disability in general), 404.1520a (Evaluation of mental impairments), 404.1527 (Evaluating opinion evidence), 404.1529 (How we evaluate symptoms, including pain); SSR 96-7p (Policy Interpretation Ruling Titles II and XVI: Evaluation Of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statements). The number and complexity of the Agency's rules and regulations increases the risk that an ALJ will err in formulating his or her opinion. In addition, the practical effect of the Agency's rules and regulations, at least in some cases, is to reverse the burden of proof from the claimant to the ALJ and to deprive the Commissioner of the deference that Congress intended her decisions. *See Retlick v. Astrue*, 930 F.Supp.2d 998, 1006-09 (E.D. Wis. 2012).

Judicial review of Social Security disability cases is also governed by what has come to be called the *Chenery* doctrine, after *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). *Chenery* itself stands for the sensible principle that a court reviewing the decision of an administrative agency, in that case the SEC, may not in effect usurp the authority of the agency by adopting a new rule as a basis for affirming a decision the agency reached on other grounds that it has since abandoned. *Id.* at 90-95. As applied in this Circuit, however, the *Chenery* doctrine has been expanded to prohibit the Commissioner from citing evidence in the administrative record or offering arguments that support the findings the ALJ made unless the evidence was also cited or argument made by the ALJ. *See, e.g., Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *but see* Bryan C. Bond, *Taking It on the Chenery: Should the Principles of Chenery I Apply in Social Security Disability Cases*, 86 Notre Dame L. Rev. 2157 (2011). Not only is the Commissioner precluded

15

from citing such evidence and presenting such arguments, she faces sanctions for doing so. *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) ("This is professional misconduct and if it continues we'll have to impose sanctions.").

The effect of this expanded application of *Chenery* is that on review, instead of trying to show that substantial evidence in the record supports the findings the ALJ made, the Commissioner is limited to arguing that the evidence explicitly cited by the ALJ constitutes substantial evidence, often in response to arguments that were not presented to the ALJ. *See Senn v. Astrue*, No. 12-C-326, 2013 WL 639257, ** 7, 8 (E.D. Wis. Feb. 21, 2013). As a result, as Plaintiff's brief in reply in this case demonstrates, the Commissioner is faced with a dilemma: If the Commissioner cites evidence to refute the claimant's argument that was not cited by the ALJ, she is accused of violating *Chenery* and risks sanctions for unprofessional conduct; if she does not cite such evidence, she is claimed to have conceded the issue by waiver. (ECF No. 20 at 2.)

The expansion of the standard of judicial review beyond the question of whether the Commissioner's findings are supported by substantial evidence has, as one would expect, substantially increased the amount of time required for judicial review of disability decisions and increased the number of cases that are reversed and remanded to the Agency for further proceedings. *See Freismuth v. Astrue*, 920 F.Supp.2d 943, 945 (E.D. Wis. 2013) (noting that 83-84% of social security disability cases filed in district in 2011 and 2012 were reversed and remanded). It has also significantly added to the cost of resolving these cases. *Id.* at 946 (noting that EAJA fees totaling $1.3 million have been awarded claimants' attorneys between 2009 and 2012). The question of whether this expansion is warranted either as a matter of law or policy, however, is not one this court is empowered to address. It is the law of this circuit, and as such, is the law I must apply in

16

resolving the appeal before me. I therefore turn to the issues Plaintiff has raised.

## A. Obesity

Plaintiff first contends that the ALJ erred in failing to properly consider Plaintiff's obesity in combination with his other impairments. Plaintiff concedes that the ALJ acknowledged his obesity. The ALJ expressly found that Plaintiff was "five feet seven inches tall, weighs 227 pounds and has a body mass index of 35.55, which is obese," though there was also evidence that Plaintiff weighed only 210 pounds and had a body mass index of only 31.9 at the time of or shortly after the hearing. (R. 23, 537.) The ALJ also acknowledged that "obesity increases the risk of developing a number of additional diseases including cardiovascular diseases and diabetes," and "also increases the strain on muscles and joints leading to musculoskeletal disturbances." (*Id.*) Notwithstanding his acknowledgment of these facts, however, the ALJ found "no evidence" in the record that Plaintiff's obesity "is currently associated with any musculoskeletal, cardiovascular, respiratory or metabolic disorder." (*Id.*) As a result, the ALJ concluded that Plaintiff's obesity was "not severe enough to be disabling." (*Id.*)

Plaintiff contends that "the ALJ's perfunctory dismissal of obesity is contrary to the requirements of Social Security Ruling 02-1p and renders the decision legally deficient." (ECF No. 12 at 9.) He contends that the ALJ failed to consider his obesity a severe impairment or set forth consideration of his obesity in combination with his other impairments when determining whether his condition was presumptively disabling under the listings and when determining his RFC. (*Id.*)

Plaintiff's argument is unclear. The ALJ expressly considered his obesity and found that there was no evidence in the record that it was associated with any other impairment or disorder.

17

Plaintiff does not point to evidence in the record that suggests his obesity by itself or in combination with his other impairments added to the limitations on his functional capacity. Instead, his argument seems to be that the ALJ needed to say something more. What more he needed to say, however, is uncertain. Noting that there was no evidence that Plaintiff's weight of 227 (or 210) pounds added to his functional limitations would seem sufficient unless Plaintiff was able to point to evidence to the contrary. Plaintiff cites no evidence to the contrary either from his physicians or his own testimony or reports. I find no error in the ALJ's treatment of the issue.

Plaintiff cites *Goins v. Colvin*, 764 F.3d 677 (7th Cir. 2014), in support of his argument that the ALJ's treatment of his obesity was inadequate. But in *Goins*, the plaintiff suffered from degenerative disk disease and a ruptured disk with radiculopathy, and she testified that she weighed 250 pounds. The ALJ in that case dismissed her obesity noting that she could walk. The Seventh Circuit concluded that ALJ's consideration of the plaintiff's obesity was inadequate because he failed to consider its impact upon her degenerative disk disease: "Pain and numbness in the legs caused by spinal disease are bound to be aggravated by obesity." 764 F.3d at 681. Plaintiff argues that like the claimant in *Goins*, he too suffers from degenerative disk disease which has resulted in upper extremity limitations including limited motion, decreased strength, and difficulties with numbness. (ECF No. 12 at 10.) As in *Goins*, he argues, the ALJ erred in failing to address the impact of his obesity on these limitations.

This case is not like *Goins*. In *Goins*, the claimant had a ruptured disk in the lumbar region of the spine with radiculopathy extending to her legs. 764 F.3d at 678. Here, the ALJ found no evidence of spinal cord compromise or nerve root compression. (R. 26-27.) Magnetic Resonance Imaging (MRI) of his cervical spine repeatedly showed mild foraminal narrowing at C4-5 which was

not viewed as the source of Plaintiff's upper extremity symptoms. (R. 239, 426, 567.) An MRI of the lumbar spine likewise was essentially normal with "minimal degenerative disk disease particularly at L5-S1 but only slight disk bulging which is confined to the epidural fat and does not impinge on the spinal cord." (R. 569.) A January 2013 EMG and nerve conduction study also ordered in response to Plaintiff's "diffuse complaints of myalgias, weakness in arms and legs as well as radicular like symptoms radiating from the neck to the arms and the back to legs with dysesthesias, generalized" was also "minimally abnormal." (R. 508, 26.) The study revealed "no evidence for myopathy, polyneuropathy or radiculopathy." (R. 508.)

Further, in a report issued two weeks after the hearing before the ALJ, Dr. Diaz summarized Plaintiff's medical history noting that although he presented with a multitude of complaints in January, "his exam revealed no obvious neurological deficits." (R. 509, 26.) Dr. Diaz noted Plaintiff "had more give away due to pain in the right shoulder and left hip. He claims saddle anesthesia, weakness in all four limbs which would be concerning spinal stenosis but he does not have any B/B symptoms and no hyperreflexia with normal strength and no clonus." (R. 509.) In fact, based on the absence of abnormal findings from MRIs, EMG, nerve conduction study and his own exam, Dr. Diaz "suspected a significant overlap of anxiety/functional deficits." (*Id.*)

Based on this evidence, summarized in detail in his decision, the ALJ adequately considered Plaintiff's obesity. As noted, the ALJ found no evidence that Plaintiff's obesity was associated with his other impairments, and Plaintiff has cited none himself. Absent such evidence, the ALJ was not required to say more.

**B. RFC**

Plaintiff next challenges that ALJ's RFC finding. He argues that the ALJ erred by not

19

identifying a "supported record basis" for the RFC finding and by not considering the cumulative effect of the impairments. The ALJ found that Plaintiff had the RFC to perform light work, meaning he could lift no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, except that he was limited to occasional pushing or pulling with the right upper extremity; precluded from reaching above shoulder level with the right upper extremity; limited to rare use of the upper left extremity for grasping and manipulating objects; precluded from climbing ropes, ladders, and scaffolding; limited to occasional crawling; should avoid more than frequent exposure to extreme cold and more than occasional exposure to vibration of the right upper extremity, and could be expected to be off task up to 10% of the work day in addition to regularly scheduled breaks due to pain from orthopedic disorders.

Plaintiff's argument seems to be that the ALJ failed to cite any support in the record for several of the limitations he included in his RFC. How did the ALJ arrive at this specific RFC finding, Plaintiff asks rhetorically? For example, Plaintiff continues, "how did the ALJ determine that Mr. Brandenburg would be off task up to ten percent of the time due to his orthopedic pain and not fifteen percent or some other percentage?" And why would he be off task only due to orthopedic pain and not pain due to his other impairments such as migraines and tendonitis? (ECF No. 12 at 13.)

But it is not the limitations the ALJ found that are relevant to the question of whether Plaintiff is disabled, but the limitations he did not find that Plaintiff contends prevent him from working. The ALJ's finding of an off-task limitation of up to ten percent of the work day is based on his judgment as to the severity of Plaintiff's shoulder impairment, not a specific measurement. Plaintiff's argument assumes a precision that this kind of limitation does not allow. No expert

20

suggested an "off-task" limitation, and it may be that the ALJ was overly generous in including such a limitation in his RFC. Plaintiff argues that he is unable to work a full day at all, and the ALJ clearly rejected his contention. The issue is whether the ALJ erred in failing to include additional functional limitations that were supported by the evidence; not whether he included a limitation that was not supported. An RFC that includes additional limitations beyond what the evidence supports cannot harm the claimant, since any increase in limitations decreases the number of jobs a claimant can perform. Plaintiff's actual complaint is that the ALJ erred in failing to include a greater "off-task" limitation than 10%. But in fact, most of the evidence cited by the ALJ doesn't even support the 10% off-task limitation he found.

As the ALJ noted, "although the claimant has reported chronic pain in both shoulders and the lower back, x-rays of the left shoulder found only minimal degenerative changes, MRI scans of the cervical spine were near normal, and MRI scans of the lumbar spine found only mild degenerative changes with no stenosis." (R. 27, citing R. 234-308, 509-10.) Indeed, despite Plaintiff's claims that he has been unable to work since February 26, 2009, that he could not walk more than a block, lift more than ten pounds, sit for a cumulative period of more than four hours, stand for more than a cumulative period of one hour, or walk for more than a cumulative total of thirty minutes in a day (R. 193, 196), there is no support in the record for these severe limitations other than his own say so. As the ALJ pointed out, the doctors who examined him could find no cause for any of these limitations.

The ALJ also cited the reports of the state agency consultants as a basis for the RFC he adopted. As noted above, the state agency physicians who reviewed the medical record determined that Plaintiff could perform a full range of light work limited by only occasional overhead reaching.

21

(R. 398, 426.)  The ALJ expressly recounted their findings and noted that they were "supported by substantial other evidence in the record including the claimant's description of daily living, x-rays, clinical findings, and test results.  (R. 27.)  The ALJ did not simply adopt the RFC found by the state physicians, however, but added several other limitations.    He limited Plaintiff to only occasional pushing or pulling with his right upper extremity and precluded overhead reaching with the right upper extremity altogether.    And although the state agency physicians concluded that the partial amputation on Plaintiff's left hand did not impact his ability to use his hand, the ALJ limited him to rare use of his upper extremity for grasping or manipulating objects.  (R. 24, 85.)  Even with these limitations, the V.E. testified that there were a substantial number of jobs in the State that Plaintiff could perform in both the light and sedentary work categories, including information clerk, office clerk, stock clerk, surveillance monitor and interviewer.

Plaintiff also argues that the ALJ erred in failing to consider the combined impact of his additional impairments, such as his cervical radiculapathy and his obesity.  (ECF No. 12 at 15-16.)  As already discussed, however, the ALJ noted Plaintiff's obesity and concluded it did not appreciably add to his functional limitations.  As for cervical radiculopathy, Plaintiff cites Dr. Diaz's January 22, 2013 report in which Dr. Diaz found "no evidence of myopathy, polyneuropathy or radiculopathy" in the nerve conduction study.    (R. 508.)    A separate consultation with a rheumatologist was likewise negative.  (R. 536-38.)  Dr. Diaz also noted that an MRI of the cervical spine was "near normal" and only "possible old mild left C5 radiculopathy."  (R. 509.)  Plaintiff also argues that the ALJ erred in "failing to analyze Dr. Diaz's opinion of the overlap between psychological and physical symptoms."  (ECF No. 20 at 9.)  But Dr. Diaz never gave an opinion that there was an overlap between Plaintiff's psychological and physical symptoms.  He said only that

22

he "suspected a significant overlap of anxiety/functional deficits" (R. 509), and that was only because he could not find any physical cause of all of the symptoms Plaintiff claimed he was experiencing. The ALJ did not error in failing to treat Dr. Diaz's suspicion as an opinion, especially given the findings of the state consulting psychologists that Plaintiff had no significant mental impairment.

Finally, although Plaintiff does not directly challenge the testimony of the V.E. that he could perform several different types of jobs, he suggests that the limitations found by the ALJ in fact preclude most of the jobs that the V.E. identified. He notes that the V.E. testified in response to a question by his attorney, that most of the jobs he identified in response to the ALJ's hypothetical required frequent reaching, handling and fingering. Plaintiff then continues, "therefore, a restriction to occasional reaching or manipulation would preclude the jobs (except for the small number of monitor positions not relied upon by the ALJ)." (ECF No. 20 at 7.) But the ALJ did not find that Plaintiff was limited to occasional reaching or manipulation. He found that as to his right upper extremity, Plaintiff was limited to occasional pushing or pulling and no reaching above the shoulders. (R. 24.) As to the left extremity, the ALJ limited Plaintiff to rare use for grasping and manipulating. It was in response to the ALJ's hypothetical with these and other limitations that the V.E. identified jobs in both the light and sedentary category that a person with Plaintiff's age, education and work experience could perform.

Nevertheless, since for the reasons stated below, the case will must be remanded to allow a proper determination of Plaintiff's credibility, the ALJ should revisit with the V.E. whether a person with the limitations stated by the ALJ and with Plaintiff's age education and work experience could perform the jobs he identified. The record is less than clear on this issue because in an effort to

23

clarify the V.E.'s testimony at the close of the hearing, the ALJ noted that he allowed Plaintiff only "rare use of the upper left extremity for grasping and manipulation, which would essentially preclude use of the upper extremity." (R. 84-5.) The V.E. was not asked if his answer would be the same with that understanding. If the ALJ intends to preclude all use of the upper left extremity, he should make that clear in a restatement of his hypothetical question to the V.E. If he did not intend to preclude all use of the left upper extremity, the ALJ should also clarify on remand whether he intended to limit Plaintiff's overhead reaching with his left upper extremity since the state agency doctors he referenced appear to have found that Plaintiff was limited to occasional overhead reaching as to both upper extremities. (R. 398, 426.) If he includes no limitation on overhead reaching with the left upper extremity, the ALJ should explain why he disagrees with this aspect of the opinions offered by the state agency physicians.

## C. Opinion Evidence of Treating Physician

Plaintiff next contends that the ALJ erred in "jettisoning the opinion of the treating specialist orthopedist Dr. Shuler who opined that Plaintiff's work restrictions included a limitation to lifting ten pounds and no overhead work with either extremity." (ECF No. 20 at 9-10.) It is well established that an ALJ must "give controlling weight to the medical opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (internal quotations omitted). On the other hand, when a treating physician's views do not meet this standard, the ALJ may discount the opinion because "a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Here, the ALJ acknowledged the treating

24

physician rule but found that Dr. Shuler's opinion was "not well-supported by the objective medical evidence and is inconsistent with substantial other evidence in the record." (R. 27.) The ALJ did not err in doing so.

At the outset, it is important to state what Dr. Shuler's opinion was. As noted above, Dr. Shuler wrote two letters "to whom it may concern" in July 2010, at Plaintiff's request, in which he stated that Plaintiff could return to work but was not to lift more than ten pounds or perform any overhead work with either arm. The first, dated July 7, 2010, was written after Plaintiff reported that his shoulder symptoms had gotten worse and that he was experiencing numbness in both hands and couldn't pick up anything. (R. 240, 241.) Believing the symptoms were related to his cervical spine, Dr. Shuler ordered an MRI and provided Plaintiff a "work note" as he requested. The note stated the restriction would last until further notice and noted that an MRI had been scheduled and a return evaluation pending. (R. 240.) When the MRI came back essentially normal with "mild left-sided neural foraminal narrowing at the C4-5 level, Dr. Shuler scheduled a consult with Dr. Fowler and wrote a new note continuing the restrictions "through his pending appointment with Dr. Fowler. (R. 237-39.) Dr. Fowler completed his examination by July 28, 2010, and the limitations were not continued. (R. 310-14.) Instead, Dr. Fowler recommended that Plaintiff become actively involved in a treatment program with regular exercise, develop a future work plan, use massage and over-the-counter medications, and resume leisure activities. (R. 313.) Thus, as the Commissioner suggests, it appears that the limitations Dr. Shuler set were only intended to be temporary. To the extent the restrictions were intended to be permanent, the ALJ's rejection of them is supported by substantial evidence.

First, as the ALJ noted, the restrictions set by Dr. Shuler in July 2010, were not well-

supported by objective medical evidence. Indeed, there is no objective medical evidence in the record that supports such an extreme limitation. It was the absence of such evidence that led Dr. Shuler to order more testing (X-rays, MRIs, Nerve Conductivity) and consult first with Dr. Fowler, and later with Drs. Diaz and Malone, in an effort to determine the cause of Plaintiff's complaints. As the ALJ's discussion of the medical record demonstrates, the effort was ultimately unsuccessful. To this day, no doctor has offered an opinion as to the cause of Plaintiff's "diffuse complaints of myalgias, weakness in arms and legs as well as radicular like symptoms radiating from the neck to the arms and the back to legs with dysesthesias, generalized." (R. 508.)

In addition, as the ALJ pointed out, to the extent Dr. Shuler's limitations were intended to be permanent, they are inconsistent with substantial other evidence in the record, in particular, the reports of the state consultants. Both Drs. Byrd and Walcott, based on their review of the entire record as it existed more than two years after Plaintiff's alleged onset date, including the two letters authored by Dr. Shuler, concluded that Plaintiff was capable of light work with occasional overhead reaching. A ten-pound lifting limit would also seem inconsistent with the 5/5 strength Plaintiff exhibited in his upper extremities when examined by Dr. Fowler. (R. 312.) In any event, the ALJ did not err in rejecting Dr. Shuler's opinion as set forth in his July 2010 letters.

**D. Credibility Assessment**

Plaintiff next argues that the ALJ erred in his credibility determination. Credibility determinations in social security disability proceedings are not a simple matter of an ALJ saying whether or not he or she believes the claimant. As the ALJ acknowledged, referencing 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96-4p and 96-7p, a credibility determination must be made by the ALJ when it is determined that the claimant's medically determinable impairments could

26

reasonably be expected to produce the pain or symptoms the claimant says he has, but the intensity, persistence or functionally limiting effects of the pain or other symptoms are not substantiated by the objective medical evidence. The ALJ must in that event make a finding on the credibility of the claimant's statements based on a consideration of the entire case file. (R. 24.) In making such a determination, the ALJ must consider, in addition to the objective medical evidence, the following factors:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96–7P, 1996 WL 374186, *3 (S.S.A.)
.

Moreover, it is not enough to simply list the factors, or provide a conclusory statement to the effect that the testimony has been considered but found not credible. *Id.* at ** 2, 4. Nor can a credibility determination be based on the obvious fact that the claimant has much to gain, literally tens of thousands of dollars and free medical care, if he is believed, since the same motivation exists for all claimants. Under Social Security Ruling 96–7p, the ALJ's determination or decision regarding claimant credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the

27

reasons for that weight." *Id.* at * 2.  And while the absence of objective medical evidence is a factor the ALJ can consider, "allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence." *Id.* at 6.

On review of a decision of the Commissioner, a court must defer to an ALJ's credibility determination unless it is patently wrong.  *Engstrand*, 788 F.3d at 660.  At the same time, an ALJ must competently explain an adverse-credibility finding with specific reasons "supported by the record." *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015).  "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

Plaintiff argues here that the ALJ failed to consider all of the factors listed in SSR 96-7p (including daily activities; aggravating and precipitating factors; medication types, dosages and effects; etc.) and improperly rejected Plaintiff's complaints of pain based on the absence of significant physical and diagnostic examination results and Plaintiff's daily activities.  (ECF No. 12 at 22-23.)  He notes that it is improper for the ALJ to reject a claimant's alleged symptoms simply because they are "unsupported by significant physical and diagnostic examination results." (*Id.* at 22, citing *Pierce*, 739 F.3d at 1049-50.)  Plaintiff also argues that the ALJ failed to explain why his daily activities were inconsistent with his alleged symptoms, erroneously found that his migraines were controlled by medication, and ignored the effects of his pain medication.

In response, the Commissioner contends that the ALJ "found Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that his

statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC finding and the objective evidence." (ECF No. 18 at 12.)   In other words, the Commissioner claims that the ALJ used the same boilerplate language that the Seventh Circuit has been criticizing for at least the past five years in an effort to comply with the SSA regulations and rulings governing credibility determinations. *See, e.g., Minnick v. Colvin*, 775 F.3d 929, 936-37 (7th Cir. 2015); *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

In fact, the boilerplate language cited by the Commissioner does not appear in the ALJ's decision.   More importantly, however, what also is missing is the analysis required by the Agency's regulations and rulings for claimant credibility determinations that the boilerplate is intended to reflect.   First, there is no finding by the ALJ that the medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms.   Instead, after recounting the Plaintiff's allegations (R. 24-25), the ALJ proceeded to his consideration of the medical evidence (R. 25-27), which resulted in the conclusion that the objective medical evidence "does not support the claimant's allegations that he has been disabled since February 26, 2009." (R. 27.)   But the finding that the medical evidence does not support the claimant's allegations that he is disabled is not the same as a finding that the medically determinable impairments could not reasonably be expected to cause the symptoms claimed.   The ALJ should first have made a finding whether Plaintiff has a medically determinable impairment that could reasonably be expected to cause his alleged symptoms.   It is by no means clear, for example, that he has an impairment that could reasonably cause his alleged leg, knee and hip pain, and his inability to walk more than a block. (R. 53.)   If he does not, the ALJ may reject those alleged symptoms for that reason alone.   Only if a

medically determinable impairment could reasonably cause such symptoms must the ALJ turn to the factors in SSR 96-7p to assess the credibility of the claimant's statements.

As to symptoms alleged by the claimant that the medically determinable impairments could reasonably be expected to cause, but whose intensity, persistence or functionally limiting effects are not substantiated by the medical evidence, the ALJ made no credibility finding. Of course, implicit in the ALJ's denial of Plaintiff's application is his rejection of Plaintiff's statement that he could not walk more than a block, lift more than ten pounds, sit for a cumulative period of more than four hours, stand for more than a cumulative period of one hour, or walk for more than a cumulative total of thirty minutes in a day. (R. 24-25.) For if the ALJ believed this statement, he would have to have concluded Plaintiff was disabled. But the ALJ provided no explanation, other than the absence of objective medical evidence, as to why he found Plaintiff's statement, the import of which is that he was essentially bedridden eighteen and one-half hours a day, incredible. And as already noted, absence of objective medical evidence by itself is not enough to disregard a claimant's report of symptoms unless the ALJ has found that the medically determinable impairments could not have reasonably caused the symptoms claimed. 20 C.F.R. § (c)(2); SSR 96-7p, *6. Of course, if the ALJ has reason to believe Plaintiff significantly exaggerated his symptoms in his report to the Agency, he can reasonably question his other statements as well. *See, e.g., Turner v. Colvin*, No. 12-2210-KHV, 2013 WL 5466677, * 11 (D. Kan. Sept. 30, 2013). But this is the kind of analysis the Agency regulations and rulings require the ALJ to undertake. No such analysis appears in the ALJ's decision.

Also missing from the ALJ's analysis is any discussion of inconsistencies between Plaintiff's statements to the Agency and his contemporaneous statements to health care providers, the type and

30

dosages of the medication he was taking, or any discrepancy between Plaintiff's allegations of the frequency and severity of his symptoms and his efforts to obtain treatment. Instead, the ALJ cited only Plaintiff's account of his daily activities as suggestive that he was capable of performing light work. But there is no explanation as to why his daily activities suggest a capacity to perform light work. In other words, the ALJ does not describe the activities Plaintiff admits to performing in sufficient detail to allow a reviewing court to assess the reasonableness of his conclusion that they evidence a capacity to perform light work activities on a sustained basis.

The Seventh Circuit has cautioned ALJs about relying on vague descriptions of daily activities as a basis for finding disability claimant's statements about their limitations incredible. *See Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) ("As we have said, it is proper for the Social Security Administration to consider a claimant's daily activities in judging disability, but we have urged caution in equating these activities with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member."); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) ("minimal daily activities" such as preparing simple meals, weekly grocery shopping, taking care of family member, and playing cards "do not establish that a person is capable of engaging in substantial physical activity"). Here, if Plaintiff is to be believed that his body only lets him sit around and watch television and that he suffers from frequent and debilitating migraine headaches, he does little more than keep watch over his young daughter, cook simple meals, only occasionally use a riding lawn mower and snowblower to cut the lawn and remove snow at a nearby apartment complex using mostly his knees to steer, and can't even lift a gallon of milk, then it would seem to follow that he is unable to perform even sedentary work on a sustained basis. The ALJ cannot avoid making a credibility determination by saying that Plaintiff's

31

daily activities suggest a capacity to perform light work unless he explains how.  Because the ALJ failed to comply with the procedure for assessing a claimant's credibility and failed to even determine the credibility of Plaintiff's statements, the case must be remanded.

**E. Migraines**

Lastly, Plaintiff contends that the ALJ erred in failing to properly analyze his migraine headaches.  Plaintiff testified that he had problems with migraine headaches since he was a child, that he gets them four or five times a week and that they last all day.  (R. 68.)  He testified that he takes medication but it does not work, and sometimes he has to go to the hospital to get a shot.  (R. 69.)  Given this testimony and the medical record showing Plaintiff's complaints of migraine headaches, Plaintiff argues that the ALJ erred in finding that his migraines were controlled by medication and failing to add any functional limitation in his RFC to account for the symptoms he described.

There is substantial evidence that Plaintiff's migraines were controlled by medication at least until 2012.  Though he testified that he suffered from migraines since he was a child, there is no evidence it interfered with his work before he was terminated in December of 2008.  As noted above, Plaintiff estimated that he had only one headache per month in January 2009, and as late as July 2010, he reported that Imitrex works great for his head aches.  (R. 292.)  In July 2011, he reported frequent headaches but continued to report that Imitrex works.  (R. 421.)  It was only in 2012, after his application for disability insurance benefits and SSI had been denied initially and on reconsideration (R. 96-104, 107-24), that Plaintiff's reports of migraines began to increase.  On March 26, 2012, Plaintiff reported that he had been having two to three migraines per week since he suffered a concussion three weeks earlier, but continued to take Imitrex, and as late as May 2012,

he reported that his headaches went away if he took his pills. The first medical report of the kind of debilitating migraine Plaintiff described in his testimony appears in an emergency department record of a visit Plaintiff made to Waupun Memorial Hospital on December 7, 2012, less than two months before his hearing before the ALJ. (R. 505.) Plaintiff made two more trips to the emergency room for migraines in May and June of 2013, but this was after all the evidence was closed and the ALJ had issued his decision.

In light of the more recent evidence of Plaintiff's difficulties with migraine headaches, the ALJ should include in his decision on remand an assessment of the credibility of Plaintiff's testimony that he suffers from debilitating migraine headaches that are not controlled by medication. If Plaintiff's testimony is believed, then clearly his migraines are not controlled and warrant a further limitation of his RFC to account for the symptoms he alleges. If, on the other hand, the ALJ concludes his testimony regarding migraines is not credible and explains why, he is free to reject it and no further limitations of Plaintiff's RFC are required.

## CONCLUSION

For the reasons set forth above, the Commissioner's decision is reversed and the case is remanded pursuant to 42 U.S.C. § 405(g) (sentence four) for further proceedings. On remand, the ALJ should clarify Plaintiff's RFC and the testimony of the V.E. He should also determine whether Plaintiff's medically determinable impairments could reasonably produce the symptoms Plaintiff alleges, and if so, whether Plaintiff's allegations as to the intensity, persistence and limiting effects of his symptoms, including those symptoms he attributes to his migraine headaches, are credible. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** this 11th day of August, 2015.

/s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

34